# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | No. 2:23-cv-02280 |
| v. | ) | |
| | ) | Judge Colleen R. Lawless |
| MARIAH N. YOUNG et. al., | ) | |
| | ) | |
| Defendants | ) | |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER[1]

### INTRODUCTION

Plaintiff John Doe ("Plaintiff" or "John" or "Doe"), an undergraduate student at the University of Illinois Urbana Champaign ("UIUC" or the "University"), was dismissed from the University effective December 1, 2023, with leave to petition to be readmitted in approximately nine months (for the Fall 2024 semester), for violating the University's Student Code. After a full investigation and live hearing pursuant to the University's Student Disciplinary Procedures, Doe was found responsible for committing sexual assault (both Title IX and non-Title IX) by fondling another undergraduate student, Jane Roe ("Jane," "Roe" or "Complainant") without consent on May 1, 2022. Doe appealed and the finding was upheld. Plaintiff now seeks a temporary restraining order from this Court only as to his alleged Title IX claim to halt the Defendants' enforcement of Doe's dismissal from the University, which must be denied for a lack of likelihood of success on the merits and the absence of any irreparable harm.

---

[1] This opposition is filed on behalf of Mariah N. Young. Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and other court filings also name additional defendants, but none of the defendants has yet been served.

The crux of Plaintiff's argument on the merits is that Title IX "explicitly forbids" the Defendants from exercising jurisdiction over Roe's allegations because the assault took place in Nashville, Tennessee, not on the University's campus. Plaintiff is wrong. Title IX regulations and regulatory guidance and the University's Student Code permits the University to investigate and discipline any sexual misconduct between two students under non-Title IX policies. Although a finding of Title IX sexual assault was appropriate given the involvement of a Registered Student Organization like Plaintiff's fraternity, Doe was also found responsible for non-Title IX sexual assault under the Student Code, which allows the University to discipline students for any conduct that substantially affect the university community's interest, even if such actions do not occur on university premises. In other words, even if Roe's allegations did not meet the definition of Title IX Sexual Harassment under the Student Code, the University may still investigate and adjudicate sexual misconduct prohibited by the Student Code, such as sexual assault that includes fondling another person without consent.

Moreover, Plaintiff received more process and rights—not less—under the University's Title IX procedures. Namely, in addition to receiving the process for non-Title IX sexual assault, Plaintiff's attorney was able to attend the hearing and cross-examine the Complainant under Title IX procedures. Receiving more opportunity to defend himself cannot itself be a Title IX violation. Sanctions options for sexual assault findings are also the same under Title IX and non-Title IX policies.

Plaintiff's other assertions that the University's investigation was unfair also fail to create the necessary likelihood of success on the merits of his Title IX claim, which requires a sufficient showing of gender bias. Plaintiff primarily challenges procedural aspects of the University's handling of his disciplinary charges, without any allegations that action was taken toward Doe

2

because he is male. To the contrary, the University's finding of sexual assault is supported by ample evidentiary record that belies the few unsupported suggestions of gender bias asserted by Plaintiff.

Despite numerous opportunities, Plaintiff did not participate in the disciplinary process in any meaningful way. For example, Plaintiff did not even try to explain his admissions of wrongful conduct (*i.e.*, touching Roe under her clothes without consent) in text messages exchanged with Roe during the week following the alleged assault. Plaintiff did not answer questions during the investigation, did not identify witnesses, and did not attend the hearing (except through his attorney). Plaintiff did not express a position on any fact at issue in the disciplinary process other than a letter from his attorney denying the allegations of misconduct. The University, without motivation based on gender, correctly relied on Roe's account of what transpired, which was never contradicted by Doe, and text messages in which Doe admitted the conduct at issue.

Plaintiff also has not sued any institutional defendant, which is required to state a viable claim for any Title IX violation.

In addition to a lack of likelihood of success on the merits, the Court should deny Plaintiff's Motion because Plaintiff cannot show irreparable harm. Plaintiff seeks to change the status quo by reversing his dismissal from the University and allowing him to seek to graduate "on time" this coming Spring, restore his status as a student immediately, remain enrolled in classes for both the Fall 2023 semester and Spring 2024 semester, and allow him to take final exams during December 2023. In doing so, Plaintiff ignores a long line of cases, including several from this district, that held dismissed students seeking to shorten any "gap" in their education via injunctive relief lack irreparable harm. Like those cases, Plaintiff does not require mandatory injunctive relief to avoid irreparable harm because he has ample monetary remedies available.

For these reasons, this Court should deny the motion for temporary restraining order and preliminary injunctive relief.

## RELEVANT BACKGROUND

### I.     University Policy and Procedures

Sexual misconduct complaints against students at UIUC are governed by the University's Sexual Misconduct Policy ("Policy") contained in the University's Student Code. *See Student Code*, University of Illinois Urbana-Champaign, https://studentcode.illinois.edu/article1/part1/1-111/. The Policy defines "Sexual Misconduct" broadly as "Title IX Sexual Harassment, sexual harassment, sexual assault, dating violence, domestic violence, stalking, sex or gender-based conduct, sexual violence, or sexual exploitation." *Id*. at Section 1-111.f.1. More specifically, the Policy defines various categories of "Title IX Sexual Harassment," which include "sexual assault" that occurs within a "education program or activity of the University." *Id*. at Section 1-111.d.f..3. Also, the Policy clarifies that "Prohibited Sexual Misconduct" is "any conduct prohibited by this policy other than Title IX Sexual Harassment," which includes "sexual assault-forcible fondling" without regard to whether such conduct occurs within an education program or activity. *Id*. at Section 1-111.f.2., 4.A.

The Policy provides for two potential processes to address sexual misconduct issues: (1) a "Title IX Sexual Harassment Process" to address allegations of sexual misconduct that meets the definition of "Title IX Sexual Harassment" pursuant to what is referred to as the "Student Conduct Protocol for Allegations of Title IX Sexual Harassment"; and (2) "Prohibited Sexual Misconduct Processes" for "reports or complaints of sexual misconduct that are not one of the categories included in Title IX Sexual Harassment," which is referred to as "Case Coordinator and

Subcommittee Hearing Procedures (for non-Title IX prohibited sexual misconduct allegations)." Section 1-111.d, e; *see* https://wecare.illinois.edu/policies/campus/.

In other words, the University maintains both a Title IX process and a non-Title IX process that may apply to allegations of sexual assault. The two procedures are largely similar, as they involve an investigation, an investigation report that is shared with both parties for review and response, and a live hearing before a three-person decision panel. *See id.* The primary difference between the procedures is that, in the Title IX process, each party's advisor has a speaking role in the form of an opportunity to cross-examine the other party or any witnesses at the hearing. *See id.* In the non-Title IX process, advisors do not have a speaking role, there is no direct cross-examination, and the parties may suggest questions to the Chair of the hearing panel to be posed to the other party or witnesses. *See id.*

## II.    **John Doe's Disciplinary Matter**

Doe was charged with two Policy violations: the non-Title IX "sexual assault" in Section 1-111.f.4 and "Title IX Sexual Harassment" in Section 1-111.f..3. As a result, OSCR engaged the Title IX procedures to the claims against Doe.

Jane Roe was interviewed on June 26, 2023, and she submitted text message evidence on June 30, 2023. *Exhibit A*, pp. 4-14, 28-33. Her statements included the following:

- Jane and John were close friends but not romantically involved before John invited her to a fraternity formal event in Nashville, Tennessee, which they traveled to together and stayed in a hotel room overnight on May 1, 2022;
- Jane and John consumed drugs that night, including ecstasy at dinner and marijuana from a THC pen at John's insistence while the two were laying in bed at approximately 1:00 a.m., which led Jane to feel intoxicated at a level she reported as 9 out of 10;
- Jane went to sleep clothed in bed with John and was in and out of consciousness, when she felt John touching her legs over her clothes, then reaching under her clothes and touching her vagina (on the outside, on the labia majora) and touching her breasts over her clothes for approximately 5-10 minutes;
- John did not obtain consent (verbally or otherwise) for touching Jane sexually;

- The next day, John and Jane did not discuss the touching incident but did exchange text messages starting May 2, 2022 and over a period of about a week in which John acknowledged touching Jane under her clothes and apologized repeatedly.

Specifically, the text exchanges that Jane submitted as evidence included the following:

[Jane]: I didn't want to bring this up during the trip because I didn't want to ruin it for anyone, but do you remember what happened in the hotel? I remember I was so gone and I couldn't move but I was sort of aware, and I remember feeling you touching me like under my clothes. I guess I just want to know why you did it, and I'd also like to know if anything else happened while I was asleep. I spent all day yesterday tryna figure out what to say or do about it. i don't mean to attack you or make you feel bad I just need to know what happened and hear your perspective.

[John]: I am so incredibly sorry if I made you feel uncomfortable in any way, I was feeling you under youre clothes but only because I felt that we were comfortable enough with each other to do so. Nothing happens besides that and honestly I was just going between the covers cuz felt nice on my hand while rolling. I really am sorry if I crossed a line or ruined the trip for you with those actions, I didn't mean any harm or want to do anything you arnt comfortable with

[…]

[Jane]: I don't hate you, It seems to me like you didn't realize what you did was technically assault and I appreciate your apology. but the way you handled it after confused me because you seemed more worried about the cooler and the streak than how I might be feeling. I trusted you and it feels like I shouldn't have, and that makes me sad because I trust people so easily and it backfires on me a lot. I can't really say what will happen in the future, but i'm at home now.

[John]: I didn't mean to make you think that my largest concern was the streak and cooler. The reason I asked for those and didn't ask about the situation earlier is because I didn't want to rush you to have the conversation, I have a lot of questions about all of Sunday but I didn't want to bombard you with all of them over text and make you feel like I was being impatient by not giving you enough time. How I thought was the best way to handle this (which I know see was wrong) was to ask for the cooler then when I see you ask if we could have a conversation about everything later but sense you left I can't really do that. i just truly thought that was the best orders of operation. I do see now that what I did was completely and utterly wrong (I honestly don't know what the fuck was wrong with me to think that was I did was okay at the time I am sorry again) and moving forward in my life I will make sure this situation doesn't happen again(I actually do know what the fuck was wrong with me, it's cuz I wasn't thinking about your feeling and how you would feel in that situation). your trust in me is completely gone but I really do wanna gain the trust you had in my back. I know this isn't going to be easy in any way or take little time sense you need to see actual character change in regard to what I did to you, but honestly really enjoyed hanging out with you and"

*Id.* at pp. 28, 31-32.

John was interviewed on July 25, 2023, with his attorney advisor (Brandon Brown) present. *Id*. at pp. 15-18. He chose not to provide any substantive information, did not address the texts he had sent Jane, and did not identify any witnesses. Instead, in response to questions asking that he describe what happened in May of 2022, how he first met Jane, how he would describe his relationship with Jane, whether he had any witnesses he wanted investigators to speak with, or anything to do with the allegations, John repeatedly said: "Based on the advice of my attorney, I'm unable to answer that question at this time. I may be able to answer that question at a later date and time." *Id*. at pp. 16-18. John also said, "we look forward to providing answers to the questions after receiving notes" and "we look forward to providing supporting information once we receive the notes." *Id*. at p. 17.

Two witnesses Jane had identified were interviewed. Another fraternity member who was in the hotel room on the night at issue explained that he was asleep and did not observe anything unusual between Jane and John. *Id*. at pp. 19-23. Jane's roommate explained that, on May 2, 2022, the night Jane returned from Nashville, Jane said that John had touched her under her clothes, and that Jane confronted John by text and he admitted to pretty much everything. *Id.* at pp. 22, 26.

A 33-page evidence packet was assembled, which included a Title IX Formal Complaint, notes of the interviews of Jane, John, and two witnesses, and the text messages between Jane and John from May 2, 2022 to October 19, 2022. *Id*. John and Jane each received the evidence packet and had an opportunity to submit written responses. Again, John did not respond with any substantive information. Rather, his attorney sent a short letter that generally denied any wrongdoing without addressing any specific facts. *Exhibit B*.

A three-person panel ("Panel") convened a hearing on November 1, 2023. *Exhibit D* at p. 1. Jane attended. *Exhibit C* at p. 1. John did not his own hearing. *Id*. at p. 1. Instead, Plaintiff's attorney-advisor, Brandon Brown, attended and cross-examined Jane. *Id*. at p. 1. On November 8, 2023, the Panel issued a written decision explaining that John was found responsible for Sexual Assault (fondling) and Title IX Sexual Harassment, sexual assault, and he was dismissed from the University with eligibility to petition for readmission for the Fall 2024 semester. *Exhibit D* at p. 1-3. That decision letter included reasoning that Jane's statements and evidence in the form of text messages were consistent, that Plaintiff' specifically stated "I touched you under your clothes" in text messages with Jane and did not dispute that he did, and that he apologized for doing so on several occasions in text messages. *Id*. at p. 2.

John appealed that decision, and an appeal committee reviewed the hearing recording, all documentation from the hearing, and John's appeal letter, and then met on November 30, 2023 to consider the appeal. *Exhibit E*. John's appeal identified two issues: (1) procedural irregularities; and (2) sanctions not appropriate for the violation. *Id*. at pp. 1-2. The appeal panel considered these issues and rejected them as reflected in a December 1, 2023 letter. That letter explained that the dismissal with option to petition for readmission in the Fall 2024 was appropriate with published sanctioning guidance, and described the following rationale regarding Plaintiff's jurisdiction argument:

- *To the point that there were concerns about jurisdiction through a Title IX lens: A recognized student organization (RSO) organized an off-campus formal event in Nashville, TN. As this event was an RSO sponsored event through an affiliation with the national fraternity's office, once the students left the Champaign-Urbana area and until their return to Champaign, the trip was a university endorsed activity. The university's Title IX procedures were applied in alignment with the Department of Education's guidance.*
- *To the point that there were concerns about an off-campus incident not affecting the university community's interest: Even if the Title IX jurisdiction application had failed, according to Student Code 1-301.b, the university's interest was affected when one*

*student allegedly was involved in misconduct towards another student. According to Student Disciplinary Procedures Article One, Section 1.05, the "alleged misconduct indicates the student poses a threat to the safety or security of any individual" directs the conduct process to evaluate and adjudicate.*

*Id.* at p. 1.

## ARGUMENT

### I.      Legal Standard

Courts apply the same standard for analyzing motions for temporary restraining orders and preliminary injunctions. *See Bernina of Am., Inc. v. Fashion Fabrics Int'l, Inc.*, No. 01 C 585, 2001 WL 128164, at *1 (N.D. Ill. Feb. 9, 2001). "To obtain a preliminary injunction, a plaintiff must show that: (1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020) (quoting *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)). The plaintiff bears the burden of persuasion with regard to each factor. *See Cox v. City of Chi.*, 868 F.2d 217, 222 (7th Cir. 1989). If the plaintiff fails to meet even one of the prerequisites, then the injunction must be denied. *Id.* at 223. As the Seventh Circuit has stated, "[a] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Goodman v. Ill. Dep't Fin. & Prof'l Reg.*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (emphasis in original). "The moving party's likelihood of prevailing on the merits must exceed a mere possibility of success." *DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir. 2022) (quotations omitted). If the Court determines that the plaintiff has established the initial temporary restraining order prerequisites, then the Court must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing

that harm against the irreparable harm the moving party will suffer if relief is denied. *See Speech First, Inc.*, 968 F.3d at 637.

"[O]rdinarily the function of a preliminary injunction is to preserve the status quo pending final determination of the merits" of a case. *Jordan v. Wolke,* 593 F. 2d 772, 774 (7th Cir. 1978). Mandatory injunctions that seek to alter rather than maintain the status quo, as Plaintiff seeks here, are accordingly "cautiously viewed and sparingly used." *Id.* (reversing district court's grant of affirmative injunction requiring jail to construct visitation facilities where record did not contain "the necessary definitive support to justify the granting of [such] relief"). This Court has repeatedly refused student requests to reverse disciplinary sanctions while suits are pending as "too speculative to warrant the extraordinary and drastic remedy of an injunction." *Doe v. Bd. of Trs. Of the Univ. of Illinois,* No. 2017-CV-2180, 2017 WL 11593304, at *2 (C.D. Ill. Dec. 18, 2017) ("Doe I").

II.    **The Court Should Deny Plaintiff's Motion for a Preliminary Injunction in its Entirety.**

A.  **Plaintiff Has No Likelihood of Success on the Merits.[2]**

1.  **Plaintiff Has Not Named Any Defendant Against Whom a Title IX Complaint Can Be Brought.**

Only institutions can be sued for violating Title IX. Title IX "has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 247 (2009); *see, e.g., Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1019 (7th Cir. 1997) ("Because Title IX only protects against discrimination under any education program or activity receiving federal financial assistance . . . a Title IX claim can only be brought against a grant recipient and not an individual") (granting

---

[2] Plaintiff only argues that he has a likelihood of success on the merits of his Title IX claim, and therefore, Defendants only respond to this argument.

summary judgment for school district employees on Title IX harassment claims); *Doe v. Indiana Wesleyan Univ.*, No. 1:20-CV-00039- HAB, 2020 WL 2474483, at *3 (N.D. Ind. May 12, 2020) ("no individual liability is recognized under Title IX") (denying motion to amend to add claim of Title IX discrimination against university dean).

Here, Plaintiff has not sued any institution. He brings claims against twelve defendants: Mariah Young, Caitlin Kay, Alexander Vickery-Holland, Robert Wilczinski, Danielle Fleenor, Casey Moore, Laurie Andrews, Christopher Holmes, Darin Eastburn, Merinda Hensley, and two unnamed student panel members. Each of the named defendants are individual people, not a school, and therefore cannot be sued under Title IX. For this reason alone, Plaintiff is certain to fail on the merits and the motion for a temporary restraining order should be denied.

### 2.   Plaintiff Fails to Identify Any Title IX Violations.

Although Plaintiff attempts to bring three types of Title IX claims (deliberate indifference, erroneous outcome, and selective enforcement claims), the Seventh Circuit has clarified that "tests or categories labeled 'erroneous outcome' or 'selective enforcement' or deliberate indifference' […] need not be considered because at bottom they all ask the same question: whether the alleged facts, if true, raise a plausible inference that the university discriminated … on the basis of sex?" *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854-55 (7th Cir. 2019) (quotations omitted). Unlike lenient pleading standards for motions to dismiss, the standard for asserting gender discrimination sufficiently to obtain emergency injunctive relief is much higher. When evaluating the likelihood of success, the Seventh Circuit has explained that courts "do not accept [Plaintiff's] allegations as true, nor do we give him the benefit of all reasonable inferences in his favor. […] We also do not give [Plaintiff] the benefit of conflicting evidence, as we would in reviewing a grant of summary judgment." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022); *see also, Doe v. George*

*Washington Univ.*, 305 F. Supp. 3d 126, 134 (D.D.C. 2018) (denying motion for preliminary injunction under Title IX because even if "an inference may forestall dismissal . . . a plausible inference is not sufficient to show likelihood of success on the merits as required for a preliminary injunction."); *Ind. Univ.-Bloomington*, No. 1:18-cv-03713-TWP-MJD, 2019 WL 341760, at *1 (S.D. Ind. Jan. 28, 2019) ("A preliminary injunction is an extraordinary remedy never awarded as a right."); *Doe v. Vassar Coll.*, 2019 WL 6222918, at *11 ("There is no indication that the plaintiff's ability to meet that minimal [pleading] standard indicates that he presents a serious question on the merits for the purposes of demonstrating entitlement to a preliminary injunction."). Additionally, the Seventh Circuit has emphasized that "the federal district and appellate courts do not provide third and fourth forums—after the university committee's hearing and the administrative appeal—to decide what actually happened between Jane and John on the night" in question. *Univ. of S. Ind.*, 43 F.4th at 791. Ultimately, the question is: Can Plaintiff make a *clear showing* that the University discriminated against him on the basis of his sex? *See Goodman*, 430 F.3d at 437.

Here, Plaintiff's motion barely mentions gender bias and, when it does, articulates only generalities or arguments that simply cannot withstand scrutiny. He primarily argues that Jane's allegations fell outside Title IX jurisdiction, yet the University engaged in "jurisdictional overreach" "based entirely on John Doe's gender as a male" to use procedures that "ensure that male students accused of any type of sexual misconduct or harassment are found responsible." Dkt. 3 at pp. 5, 9. He provides no explanation for how this issue relates in any way to his status as a male, and there is no reason whatsoever to connect decisions about how to proceed with investigating Jane's allegations to the gender of either party. He offers no case law finding internal adjudication of a sexual assault claim that does not satisfy Title IX regulatory limitations on

geographical application to be a Title IX violation. Defendant knows of none.  Instead, as explained above and re-iterated below, Title IX regulatory guidance permits, and University policies and procedures specifically contemplate, investigating *any* sexual misconduct allegations between two students pursuant to other sexual misconduct policies, regardless of Title IX regulatory limitations.

In addition to lacking even a hint of gender bias, Plaintiff's "jurisdiction" argument hinges on misunderstandings of Title IX standards and misstatements of University policy, procedures, and what actually happened during adjudication of Plaintiff's student disciplinary case. Plaintiff's argument stems entirely from the fact that the alleged conduct occurred off campus in Nashville, Tennessee. Based on that, he asserts: (1) the sexual assault "had absolutely no nexus to the University of Illinois" and 2020 regulatory guidance pursuant to Title IX "explicitly forbids the Defendants from exercising jurisdiction over Jane Roe's Nashville allegations"; yet (2) Defendants "completely ignored the absence of jurisdiction," "never provided any rational," and "acted under the guise of Title IX"; and (3) "any investigation and disciplinary action taken by the Defendants was in contravention to Title IX mandates." Dkt. 3 at pp. 1, 2, 3, 5, 10, 14. These assertions cannot create any likelihood of success on the merits of a Title IX claim for a multitude of reasons.

First, any sexual assault of one current student by another poses a threat to the safety or security of a member of the University community that creates an obvious nexus to the University, and which the Student Code expressly calls for the student discipline process to address. *See Student Code*, Art. I, section 1.05. Second, Title IX regulatory guidance does not "forbid" schools from investigating sexual misconduct allegations that occur off campus or outside an educational program or activity. The preamble to the Title IX regulations states that, for sexual misconduct occurring in geographic locations that fall outside of Title IX's regulatory limitations, "nothing precludes [the university] from addressing the alleged misconduct through the [university's] own

code of conduct." 85 FR 30026, 30206. For that reason, and to protect its students, the University (like most other schools) establishes procedures that expressly allow for investigation of sexual misconduct that, for whatever reason, does not qualify as Title IX Sexual Harassment, including the geographic location of the actual assault. *See Student Code*, ("Reports or complaints of sexual misconduct that are not one of the categories included in Title IX Sexual Harassment will be addressed following the processes set out in the Office for Student Conflict Resolution's Case Coordinator and Subcommittee Hearing Procedures (for student respondents)"). Plaintiff's argument that a lack of Title IX "jurisdiction" meant that no investigation should have occurred, or that the University lacked authority to hold him accountable for sexual assault of another current student off campus lacks any support at all.

Third, there were good-faith reasons to consider Jane's allegations as meeting Title IX requirements because of the involvement of a "recognized student organization" (or "RSO"), Plaintiff's fraternity. *See* 85 FR 30026, 30197 ("a postsecondary institution must investigate formal complaints alleging sexual harassment that occurred in a fraternity or sorority building (located on campus, or off campus) owned by [or controlled by] the fraternity or sorority, if the postsecondary institution has officially recognized that Greek life organization"). Contrary to Plaintiff's arguments, explanations for why Title IX was found to apply here (the fraternity formal was considered an "RSO sponsored event" and a "university endorsed activity") were given to Plaintiff in writing in the Appeal letter, as quoted above. There is no reason to consider that assessment as having any relation to the fact that John Doe is a man.

Fourth, it is not true that the "entire basis for John Doe's dismissal was based on Jane Roe's Title IX complaint," Dkt. 3 at p. 12, because both Title IX and non-Title IX charges were at issue in Plaintiff's case. *Exhibit D* at p. 1. Again, University policy explicitly provides that OSCR is

responsible for investigating and adjudicating "reports or complaints of sexual misconduct that are not one of the categories included in Title IX Sexual Harassment." *See Student Code*. In this situation, because there were both Title IX and non-Title IX charges, the matter was administered using Title IX procedures. Even if Plaintiff were correct (which he is not) that the University should have exclusively evaluated the complaint against Plaintiff under its non-Title IX procedures (Prohibited Sexual Misconduct Processes), there was no harm to him from engaging Title IX procedures because that provided Plaintiff with *more* rights, and *more* procedural protections. Under the Prohibited Sexual Misconduct Processes, a party's advisor is not permitted to speak at a hearing and would not be permitted to attend a hearing if the party opted not to attend. *See Student Code*. On the other hand, under the University's Title IX Policy, a party's advisor is permitted to cross-examine other parties and witnesses, even if the party does not attend. *See id.* Otherwise, both procedures are fundamentally the same. For Plaintiff's case, because the Title IX procedures applied, Plaintiff's attorney was able to attend the hearing and extensively cross-examine the Complainant, even though Plaintiff himself decided not to attend. In other words, the entire "jurisdiction" argument challenges an administrative decision that provided Plaintiff more opportunities to defend himself. That cannot even be considered "adverse" to Plaintiff, much less in any way connected to his gender.

In addition to the misguided "jurisdiction" arguments, Plaintiff attempts to create gender bias inferences by claiming he was subject to a "sham investigation" that failed to engage relevant witnesses, ignored witness comments that contradicted Jane's account, and otherwise treated Plaintiff unfairly. None of that is accurate, and the entire argument is ironic, considering that Plaintiff did not participate in the entire process in any meaningful way. He met with the investigator but refused to answer any substantive question at all on the advice of his attorney,

including failing to identify any witnesses. *Exhibit A*, at p. 17. He also did not respond at all himself after receiving the evidence packet (showing what every other witness had explained) and then did not even appear at the hearing. *Exhibit B*; *Exhibit C*. In fact, despite numerous opportunities, Plaintiff himself never expressed his position on any fact or claim at issue in the disciplinary process. The closest he came to doing so was a letter from his attorney after receipt of the evidence packet that stated only: "Any and all allegations of wrongdoing or misconduct . . . are denied. The allegations lack credibility, lack reliability, and are unsustainable." *Exhibit B*. Plaintiff did not even try to explain, at any point in the process his admissions of wrongful conduct in the text messages exchanged with Jane during the week following the alleged assault. That left the hearing Panel with Jane's statements of what happened, the text messages in which Plaintiff admitted wrongdoing (touching under her clothes without her consent), and no one else who was in position to observe what Plaintiff had done (including a witness who had been in the room but asleep and otherwise unable to see Plaintiff's movements under the covers).

Plaintiff's arguments about "eyewitnesses" who were or were not interviewed, what they said, and whether they were excluded from a hearing are belied by actual records from the investigation. Investigators invited four different witnesses to be interviewed, but only two chose to do so. *See Exhibit F*. One was in the hotel room, but he explained he only briefly spoke with John and Jane before himself going to sleep, and that he did not remember seeing anyone using a vaping pen. *Exhibit A* at pp. 20-23. His statements did not address whether Plaintiff touched Jane under the bedding or not, nor had anyone described him as being in position to being able to do so. The other witness was Jane's friend who corroborated that Jane shared what had happened with Plaintiff right after returning to campus, including that Plaintiff had admitted to things in text messages. Ex. A at pp. 26-27. Contrary to Plaintiff's arguments, both of these witnesses were

notified of and invited to the hearing; they just did not attend. *See Exhibit G*. Nothing about these

witness interactions reveals any improper investigation, much less any gender bias.

Because Plaintiff cannot bring a Title IX claim against any of the Defendants in this case

and because he has failed to make a clear showing that the University discriminated against him

on the basis of sex, his request for a preliminary injunction should be dismissed.

### 3. Defendants' Decision to Follow Procedure is an Academic Decision Entitled to Judicial Deference.

In addition to the reasons set forth above, Plaintiff has not established a likelihood of

success on the merits because Defendants' decisions about how to enforce the Prohibited Sexual

Misconduct Processes and the Title IX Sexual Harassment Process are entitled to judicial

deference. As courts in the Seventh Circuit have consistently observed, the academic decisions of

universities are entitled to significant deference and cannot be disturbed absent evidence of

arbitrary and capricious conduct. *See Doe v. Columbia Coll. Chi.*, 933 F.3d at 858 (applying

academic deference to student disciplinary decisions and finding that defendant college would not

be liable "even if we find it exercised its academic judgment unwisely; rather it must have

disciplined a student without any rational basis"); *see also Bd. of Curators of Univ. of Mo. v.

Horowitz*, 435 U.S. 78, 90 (1978).

Courts grant universities this deference not only in purely academic decisions, but also in

decisions relating to student discipline. *See e.g., Columbia Coll. Chi.*, 933 F.3d at 858 (applying

deference to the university's decision in a Title IX proceeding); *DiPierna v. Chi. Sch. of Pro.

Psych.*, 893 F. 3d 1001, 1003 (7th Cir. 2018) (finding that "courts are reluctant to interfere with

the academic affairs and regulation of student conduct in a private university settling.") (citing

*Raethz v. Aurora Univ.*, 805 N.E. 2d 696, 699 (Ill. App. 2004)); *Doe v. Loyola Univ. Chi.*, No. 18-

cv-7335, 2022 WL 4535090 at *36 (N.D. Ill. Sept. 28, 2022) (emphasizing that "the discretion

[granted to universities] extends beyond academic decisions – it covers the 'regulation of student conduct,' too.").

### B. Plaintiff Has Not Shown Irreparable Harm Because Traditional Legal Remedies are Adequate.

In addition to the lack of likelihood of success on the merits of his Title IX claim, the requested temporary restraining order must be denied because Plaintiff's effort to avoid a "gap" in his education does not address any irreparable harm as a matter of law. Irreparable harm is "harm that cannot be repaired and for which money compensation is inadequate." *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (quotations omitted). To demonstrate irreparable harm, a plaintiff must show that he will suffer immediate harm that cannot be rectified by a final judgment after trial. *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 478 (7th Cir. 2001). The threat of irreparable injury necessary to justify a TRO "must be real, substantial, and immediate, not speculative or conjectural." *Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 80 F. Supp. 3d 829, 836 (N.D. Ill. 2015) (quotations omitted). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the Plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc*, 555 U.S. 7, 22 (2008).

Plaintiff attempts to assert the existence of irreparable harm based on his dismissal from the University, which he describes as "permanent." Dkt. 3 at 2. But his dismissal may only be for approximately nine months, as he has a right to petition for readmission for the Fall 2024 semester. *Exhibit E* at p. 2. He asserts: (1) his "education has been interrupted," there is a "spectre of a gap in his education," and he may not get his degree "on time"; and (2) he will suffer a "loss of employment at Hinetics" and "risk losing valuable employment opportunities in 2024." Dkt. 3 at 2, 4, 14. To avoid those outcomes, Plaintiff's motion asks this Court to "halt the Defendant's

enforcement of John Doe's dismissal," allow him to "resume his classes and status and the University," "attend school for his final semester in the spring and to graduate on time," and take his final exams for the Fall 2023 semester that are occurring in December 2023. *Id*. at pp. 1, 2, 17, 18. In other words, he asks this Court to completely reverse the outcome of his disciplinary hearing while this case is pending.

As a matter of law, monetary damages can, indeed, address each of the concerns Plaintiff asserts, none of which constitute irreparable harm. The motion for temporary restraining order should be denied in its entirety for this reason alone.

### 1.   Damages Can Address Gaps in an Academic Record.

Plaintiff's primary concern is that his dismissal, which may only last nine months, will create a gap in his academic record that constitutes irreparable harm, but he fails to cite any cases in this circuit to support this conclusion. Courts in this circuit have found that damages can remedy a gap in a student's education. *Doe I*, 2017 WL 11593304, at *2; *Doe v. Bd. of Trs. of the Univ. of Illinois,* No. 2:20-cv-02265-CSB-EIL (C.D. Ill. Nov. 23, 2020) ("Doe II")[3]; *Doe v. Trs. of Ind. Univ.*, No. 1:20-cv-02006-JRS-MJD, 2020 WL 7028030, at *7, *2 (S.D. Ind. Nov. 30, 2020) (finding that "damages would also be adequate to remedy [Plaintiff's] gap in education" where the plaintiff was found responsible for dating violence and suspended from school with the opportunity to return one year later). In *Trustees of Indiana University*, the court emphasized the very reparable nature of the Plaintiff's alleged harm, stating:

> While expulsion from medical school is serious and perhaps even devastating […], it is unclear how that fact warrants a showing of irreparable harm here because [Plaintiff] has an opportunity to" graduate "should he win on the merits.

---

[3] A copy of this order is attached as *Exhibit H*.

*Id*. at *3. This Court has reached similar conclusions in the *Doe I* and *Doe II* cases, stating (1) "a final judgment in Plaintiff's favor will allow him to return to his education. Thus, the harm although temporary, is not irreparable"; and (2) "the harm Plaintiff faces here is temporary and is not irreparable. Plaintiff will have an educational gap, but he can apply for readmission to the University after two years." *Doe I*, 2017 WL 11593304, at *2; *Doe II* at 8. *See also, Medlock v. Trs. Of Ind. Univ.,* No. 1:11-CV-00977-TWP, 2011 WL 4068453, at *9 (S.D. Ind. Sept. 13, 2011) (no irreparable harm where suspended student declined an offer to transfer to another university and would later be eligible for re-admission to IU); *Doe. v. Princeton Univ.,* No. 3:20-cv-4352-BRM-TJB, 2020 WL 2097991, at *7 (D. N.J. May 1, 2020) (no irreparable harm based on a delay in plaintiff's education analogous to suspension); *Hodges v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.,* No. CV 20-1456, 2020 WL 5017665, at *3, (E.D. La. Aug. 25, 2020) ("Numerous cases addressing this issue have concluded that delays in education pending resolution of disciplinary processes where reinstatement is sought can be compensated through monetary relief"); *Madej v. Yale Univ.,* No. 3:20-cv-133 (JCH), 2020 WL 1614230, at *6-7 (D. Conn. Mar. 31, 2020) (no irreparable harm where plaintiff's graduation would be delayed by two semesters); *Montague v. Yale Univ.,* No. 3:16-cv-00885 (AVC), 2017 WL 4942772, at *3-4, (D. Conn. Mar. 8, 2017) (harm from the delay in completing education, not graduating with contemporaries, and possibility of decreased employment opportunities were quantifiable and can be adequately remedied by money damages); *Roden v. Floyd,* No. 2:16-cv-11208, 2018 WL 6816162, at *5 (E.D. Mich. Nov. 13, 2018) ("delays in education do not constitute irreparable harm"); *Ben-Yonatan v. Concordia Coll,* 863 F. Supp. 983, 986 (D. Minn. 1994) (no irreparable harm where student suspended for one year alleged that she might not be admitted into medical school or would be delayed in entering due to the gap in her academic record).

Not only is a delay in continuing one's education not irreparable harm, but also, Plaintiff has failed to allege that he will not be able to continue his education. In the *Doe I* opinion addressing a University of Illinois undergraduate who was dismissed for sexual misconduct, this court held:

> [T]he court does not find that Plaintiff has sufficiently established that he will be unable to continue or complete his education if an injunction is not granted. While Plaintiff has alleged that he has been dismissed from the University of Illinois, there is no indication that Plaintiff is unable to attend another university. Further, although Plaintiff has been temporarily dismissed from the University, he can apply for readmission at the conclusion of his two and a half year suspension. [...] [T]he court is not convinced by Plaintiff's argument that a gap in his academic record will cause irreparable harm. The court finds Plaintiff's argument on this point to be too speculative to warrant the extraordinary and drastic remedy of an injunction. While it is possible a future employer may inquire into the gap during a job interview, it is just as likely that the topic will not be discussed. Gaps in academic records exist for all kinds of reasons. Whether an employer would notice, inquire, or even care is too uncertain. Further, even if an injunction were issued today, and Plaintiff were permitted to resume his academic career at the University, Plaintiff's academic record would contain a gap, albeit a smaller one. Therefore, for all of these reasons, the court is not convinced that a continued gap in Plaintiff's academic record constitutes irreparable harm.

2017 WL 11593304, at *2. Just like the plaintiff in *Doe I*, Plaintiff has an opportunity to apply for readmission in 2024. *Dkt*. 3 at p. 16; *Exhibit D* at p. 2.

In addition, reputational loss stemming from a gap in education is not irreparable harm. *See Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 846 (7th Cir. 2005) (reputational harm compensable with money damages). "The mere fact that Plaintiff might have to explain a gap in his studies does not automatically result in a finding of irreparable harm." *Doe v. Vassar Coll.*, No. 19-cv-9601 (NSR), 2019 WL 6222918, at *5-6 (S.D. N.Y. Nov. 21, 2019 (no irreparable harm based on suspension for a semester and delay in graduation based on sexual misconduct); *Doe II* at 9 ("harm to Plaintiff's reputation is not irreparable" as monetary damages available if he prevails); *Nimer v. Case Western Reserve Univ.*, No. 1:18CV2269, 2018 WL 5118306, at *5-6

(N.D. Ohio Oct. 22, 2018) (no irreparable harm where plaintiff, a dental student, asserted that a gap in his education would raise questions with employers and admissions committees and damage his reputation and career prospects). Similarly, this Court, in *Doe I*, denied a preliminary injunction where the plaintiff had already been dismissed for sexual misconduct because the plaintiff "failed to establish that any additional injury will result if he is forced to wait for a final judgment to restore his reputation." 2017 WL 11593304, at *2. Not only is a loss of reputation not irreparable harm, but also, Plaintiff provides no support for his assertion that his reputation is in danger because of his dismissal, especially since "the record of Plaintiff's suspension is protected from disclosure without his consent by the Family Educational Rights and Privacy Act." *Vassar Coll.*, 2019 WL 6222918, at *6 (no irreparable harm caused by suspension).

Furthermore, just like the Plaintiff in *Doe I*, Plaintiff has made no assertion that he is unable to attend another university. Because Plaintiff can receive monetary damages, be readmitted to the University of Illinois, or attend another University, the alleged harm of the gap in his education is not irreparable.

## 2. Damages Can Address a Loss of Employment.

Plaintiff asserts that "[m]onetary damages cannot compensate John Doe for the loss of employment at Hinetics."[4] Plaintiff cites no case law to support this claim, likely because the Supreme Court has clarified that lost income allegations are insufficient to justify a preliminary injunction enjoining an employee's termination. *Sampson v. Murray*, 415 U.S. 61, 91 (1974). Similarly, in affirming the denial of a physician's request for preliminary relief enjoining his termination, the Seventh Circuit held that "[t]he 'irreparable harms' of lost income and damaged reputation alleged by [plaintiff] are quite similar to those in Sampson" and, even when combined

---

[4] It is unclear why Plaintiff's removal from the University should result in the loss of his employment, and he offers no explanation.

with an "inability to find another job," are compensable through money damages and do not constitute irreparable harm. *Bedrossian*, 409 F.3d at 846; *see also Saud v. DePaul Univ.*, No. 19-CV-3945, 2019 WL 5577239, at *1-3 (N.D. Ill. Oct. 29, 2019) (no irreparable harm where plaintiff claimed that, as a result of a "botched" sexual harassment investigation, he had "been told by prospective employers that news of the accusations […] was the reason they could not work with him.").

### C. The Balance of Harms Favors the Defendants.

In addition to the reasons above, injunctive relief should be denied because the balance of harms favors the University and the interests of the public. Seeking judicial intervention to mandate Plaintiffs re-enrollment in contravention of the University's enrollment timing policies and practices would run contrary to judicial deference to the autonomy of higher education institutions for academic decisions. *See supra*. Furthermore, the University has other interests which far outweigh Plaintiff's.

First, the University has an "unquestionably powerful interest in maintaining the safety of [its] campus[]." *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000). Here, if the Court orders Plaintiff's dismissal to be lifted, penalty the University determined, in its judgment, was needed to address Plaintiff's act of sexual misconduct would be completely disregarded. This, in turn, would interfere with the University's ability to address the impact of Plaintiff's conduct not only on the Complainant but also on others in the University community and in the way it deemed most appropriate. In addition, the University also has an interest in properly disciplining its students that would be undermined if Plaintiff obtains the relief he seeks. *See Parker v. Trinity High Sch.*, 823 F. Supp. 511, 521 (N.D. Ill. 1993) (granting preliminary injunction could affect "the perception and certainty" of the school's authority); *see also Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155, 1158

23

(7th Cir. 1998) (emphasizing that lost wages can be addressed via damages but decisions about personnel within a community "can create substantial and irreversible costs."). If Plaintiff is able to undo his dismissal at this stage, the University's disciplinary system will be undermined and will fail to serve as a deterrent for sexual misconduct.

Conversely, the harm to Plaintiff is significantly more limited. Plaintiff will need to complete the dismissal he was awarded following extensive University process. He will have the opportunity to return to the University of Illinois, or he could choose to apply to another university to finish his degree. Even more, if Plaintiff wins on the merits, he will have an opportunity to be reinstated.

The University's commitment to keeping its community safe and deterring sexual misconduct far outweigh a slight delay in the completion of Plaintiff's studies. Therefore, the request for a temporary restraining order should be denied.

## CONCLUSION

Based on the foregoing, Defendant respectfully requests that Plaintiff's motion for a temporary restraining order be denied in its entirety.

Dated: December 11, 2023

Respectfully submitted,

Defendant Mariah N. Young,

By:   /s/ Peter G. Land
          One of Defendant's Attorneys

Peter G. Land (Lead Counsel) #6229659
Katherine Tierney
Husch Blackwell LLP
120 S. Riverside Plaza, Suite 2200
Chicago, Illinois 60606
(312) 655-1500
Peter.Land@huschblackwell.com

Katherine.Tierney@huschblackwell.com

*Attorneys for Defendant*
*Mariah Young*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send electronic notification to all registered counsel of record this 11th day of December, 2023:

Brandon Brown
The Brown Law Ltd.
4455 S King Drive
Suite 100A
Chicago, IL 60653
T: 773-624-8366
F: 773-624-8365
E: bbrown@thebrownlaw.com

s/ Peter Land

***Attorney for Defendant***
***Mariah Young***