**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:23-cv-02280 |
| v. | ) | |
| | ) | Honorable Colleen R. Lawless |
| UNIVERSITY OF ILLINOIS, et al | ) | |
| | ) | Magistrate Judge Karen L. McNaught |
| Defendants. | ) | |
| | ) | |

**AMENDED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF**

I.      **INTRODUCTION**

Plaintiff, John Doe ("John") files this Brief in Support of his Motion for Temporary Restraining Order and Preliminary Injunction against Defendant University of Illinois ("Defendant") and other named Defendants and individual members and associates of the Office of Student Conflict Resolution ("Defendants") in order to immediately halt the Defendant's enforcement of John Doe's dismissal from the University of Illinois, less than five days before the start of the Fall 2023 final exams.

The Defendant took this action following a sham Title IX  investigation and subsequent sham Title IX disciplinary proceedings, lacking any semblance of objectivity, fairness or due process. The Title IX proceedings arose from a spurious Title IX Complaint and allegations brought in July of 2023 by a University of Illinois student (referred to herein as "Jane Roe" and "Jane") alleging that she was sexually assaulted, by unlawful touching, nineteen months ago in May 2022, in a Nashville, TN hotel room, after a dinner and night out on the town in Nashville, Tennessee, that had absolutely no nexus to the University of Illinois.

Based on these allegations, John Doe was unlawfully and permanently dismissed from the University of Illinois. John Doe was unlawfully subjected to this unlawful action despite there being an eyewitness, who completely rejects and contradicts Jane Roe's account. This action was taken despite the Defendant having no jurisdictional authority under Title IX or under the University of Illinois Student Code and/or Disciplinary Procedures to attempt to redress Jane Roe's Title IX complaint, where she alleged an assault to have occurred over 350 miles from the University of Illinois at a time and place completely unconnected to the University of Illinois and the Defendants.

In the fourteen months between the date Jane Roe provides these allegations occurred and the date of Jane Roe's filing of the Title IX complaint, there had been no instances or allegations of misconduct or contact between John Doe and Jane Roe. Further, John Doe is a senior, approximately halfway through completing his last two semesters towards his degree in engineering, who has a clean disciplinary record at the University of Illinois. Yet, still the University of Illinois took the extreme step of permanently dismissing John Doe from the University.

John Doe has paid his tuition in full and has completed ninety percent of the first semester of his senior and final year at the University of Illinois and need only sit for his final exams to complete the fall semester (which he is now prepared to take remotely or online, on or off campus), yet he now faces the specter of a gap in his education that will have an immediate impact on his current employment, post-graduation employment and his engineering degree. Indeed, John Doe will suffer irreparable harm as a result of the Defendants' unlawful actions and John has a reasonable likelihood of success on the merits of his claims.

John has filed an amended Verified Complaint against the University of Illinois and other

Defendants seeking injunctive relief and damages. While he is entitled to relief on all counts, he moves for immediate relief only as to his claim for violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681-1688, which explicitly forbids the Defendant from exercising jurisdiction over Jane Roe's Nashville allegations, mandates that the Defendant adhere to Title IX training procedures by conducting a fair and complete investigation and bars the imposition of university discipline where gender is a motivating factor and that is unlawfully severe and inequitable.

John satisfies all the prerequisites for immediate injunctive relief. First, John Doe will likely succeed on the merits of his Title IX claims. Under Title IX and the contractual promises made to John Doe under the law, the Defendant did not have Title IX jurisdiction over Jane Roe's complaint. John had the right to procedural fundamental fairness, a fair and impartial disciplinary investigation, hearing, and appeal hearing review. The Defendants violated these rights.

For example, the Defendants completely ignored the absence of jurisdiction of the Defendant and the Office of Student Conflict Resolution to preside over and hold a hearing or issue a decision on a Title IX complaint alleged to have occurred over 350 miles from the University of Illinois, in a state that does not share a border with Illinois, completely outside of the University of Illinois' jurisdiction and unrelated to the University of Illinois or University of Illinois functions. The Defendants failed to adhere to training procedures by not fully investigating Jane Roe's allegations, including but not limited to failing to interview an eyewitness who would have been within ten feet of Jane Roe and John Doe at the time Jane Roe alleges the occurrence. The Defendants without explanation, failed to allow either of the two eyewitnesses, who would have been within ten feet of Jane Roe and John Doe at the time of the

alleged occurrence, to testify at the hearing, including the only eyewitness interviewed, who happens to completely contradict and undermine the veracity of Jane Roe's allegations. The Defendants conducted a sham "formal" hearing where the Defendants displayed overt hostility to the Plaintiff and overtly acted as an obstructionist to the Plaintiff and expressly interfered with the Plaintiff's ability to cross-examine the complainant, including but not limited to interrupting, shouting and acting as an advocate for Jane Roe, in addition to exercising a "sham" neutral authority over the hearing. Additionally, the Defendant completely ignored the absence of jurisdiction to preside over and hold a hearing or issue a decision on a complaint for an alleged violation of Student Code § 1-302.b.1, alleged to have occurred over 350 miles from the University of Illinois, in a state that does not share a border with Illinois, completely outside of the University of Illinois' jurisdiction and unrelated to the University of Illinois or University of Illinois functions.

Second, John Doe has no adequate remedy at law. Monetary damages cannot compensate John Doe for the loss of him receiving his engineering degree on time from the second most prestigious public mechanical engineering program in the country. Monetary damages cannot compensate John Doe for the loss of employment at Hinetics, where John is working on ground breaking research to enable the next generation of hybrid electric rockets for NASA which will revolutionize air transportation. Similarly, monetary damages will not remedy the notation of dismissal on his academic transcript and the inclusion of sexual misconduct and harassment findings in his permanent record.

Third, John has suffered, and will continue to suffer, irreparable harm without the grant of a temporary restraining order. John Doe's valuable education has been interrupted with less than two weeks of school remaining including his fall semester final exams. John now faces the

threat of an academic record that will include permanent and serious findings of misconduct, with offense titles suggesting far more serious conduct than that which the Defendants based its decision. In addition, John Doe will lose the opportunity to obtain his hard-earned degree on time, and will risk losing valuable employment opportunities in 2024. While John fully expects to prevail in this case on the merits, John will never recover the value of attaining his engineering degree on time and an academic transcript unblemished by a notation of dismissal. If the University's decision to dismiss John is allowed to stand, he will also suffer a gap in his schooling that he will need to explain for the remainder of his professional life, even if he is ultimately reinstated.

Fourth, the harm to John if the relief he requests is denied is far greater than any harm to the Defendants that could result from granting this relief, particularly where John Doe only seeks permission to take his fall semester final exams — and John has offered to do so remotely and off-campus.

Finally, the public has an undeniable interest in ensuring that the Defendants' wrongful, inequitable, and discriminatory conduct is enjoined. The public also has an interest in seeing that college or university students do not face dismissal, at the 11th hour, a week before final exams, after the students have paid tuition in full and completed all of the academic requirements for the semester,  particularly where the Defendants have unlawfully interfered with a student's contract with the University and caused a breach of the contract with the student and violated federal law.

## II.    FACTUAL BACKGROUND

John incorporates by reference the facts alleged in his Amended Complaint and Request for Declaratory and Injunctive Relief into this Brief, and will only summarize the facts here.

In July of 2023,  John Doe was falsely accused of sexual misconduct, specifically,

touching, in May of 2022, in Nashville, Tennessee, by Jane Roe, a female student at the University of Illinois. Defendants, under the guise of Title IX, acting completely outside of the Defendant's jurisdiction, unfairly subjected John to unfair extra-jurisdictional disciplinary proceedings and investigations, rife with procedural flaws, impartiality, lack of fundamental fairness, lack of due process and inherent gender bias, designed to ensure that male students accused of any type of sexual misconduct or harassment are found responsible.

Jane Roe alleged that after attending a Sigma Nu dinner in Nashville, Tennessee, she voluntarily ingested a Molly that she personally brought to Tennessee from Illinois. Jane Roe then alleged that after ingesting the Molly, she and John Doe spent hours out on the town in Nashville, TN walking around Nashville. Jane Roe alleged that after several hours she and John Doe returned to a private hotel room in Nashville. This private hotel room was wholly unconnected to the Sigma Nu dinner attended the day before. Upon arriving at the private hotel room, Jane Roe consensually changed into a t-shirt and shorts and consensually got into a hotel bed with John. Jane Roe then alleges that she and John Doe shared a marijuana vape pen, where Jane Roe consensually laid on John Doe, consensually cuddled with John Doe, and consensually allowed John to come closer to her as she went to sleep. Jane alleged that as she was falling asleep, John touched her underneath her clothes on her vagina, "just on the outside," while they were laying on each other in the bed. Jane Roe does not allege that John Doe used force, violence, or threats at any time. Jane Roe does not allege that there have been any subsequent or prior allegations of unwanted touching, sexual assault or abuse of any kind. Jane Roe acknowledges that there were two other people in the room within mere feet of John Doe and Jane Roe.

The entire 2022-2023 school year elapsed without Jane Roe or John Doe having contact,

seeing each other or being in the remote vicinity of each other. The entire 2023 Fall semester

elapsed without John Doe and Jane Roe having any contact of any kind. In July 2023, Jane Roe

filed a Title IX Complaint against John Doe. From the inception, the Defendants conducted and

oversaw an extra jurisdictional sham investigation, designed to find John Doe responsible for

sexual misconduct, irrespective of jurisdiction, the evidence and fundamental fairness.

      The Defendant willfully and deliberately ignored the witnesses present in the hotel room,

in order to effectuate the goal of making a finding against John Doe, and to ultimately dismiss

John from the University of Illinois. The Defendant's deliberate sub-par investigation was for the

purpose of discriminating against the plaintiff due to his status as a male accused of sexual

misconduct. One of the witnesses, a female, was never interviewed. The other witness

completely contradicted Jane Roe's allegations, including but not limited to rejecting any

allegations that Jane or John were under the influence of drugs, rejecting any allegation that John

vaped or was smoking a marijuana vape pen with Jane Roe, and rejecting any allegation that a

sexual assault occurred in the hotel room. The Defendant out of fear of further corroboration,

willfully and deliberately elected to leave the investigation incomplete. The Defendant also,

willfully and deliberately, without explanation, excluded the hotel room witnesses from the

"formal" hearing or any other stage of the Title IX proceedings.

      Ultimately, John Doe was dismissed from the University and an appeal was filed. The

appeal outlined, inter alia, the procedural irregularities and the lack of jurisdiction. The

Defendants completely ignored the substance of the appeal, failed to address each subject

highlighted in the appeal, arbitrarily affirmed the dismissal, even making and relying on pure

unsupported fabrications of fact made up by the Defendants, in their decision. John Doe is

currently dismissed from the University of Illinois, dismissed less than a week before his final

fall semester exam in his final expected fall semester of his senior year.

### III.   ARGUMENT

Fed. R. Civ. P. 65 permits a court to grant a temporary restraining order when a plaintiff has demonstrated, through specific facts in an affidavit or a verified complaint, that they will suffer "immediate and irreparable injury, loss, or damage." "In the Seventh Circuit, the standards for a TRO and a preliminary injunction are virtually identical." *Harder v. Vill. of Forest Park*, 2005 U.S. Dist. LEXIS 28068, *4 (N.D. Ill. Nov. 14, 2005). To determine whether a temporary restraining order is warranted, the party seeking the order must demonstrate that: 1) it has a reasonable likelihood of success on the merits of the underlying claim; 2) no adequate remedy at law exists; and 3) it will suffer irreparable harm if the preliminary injunction is denied. *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 474–75 (7th Cir. 2001); *Cumulus Radio Corp. v. Olson*, 80 F. Supp. 3d 900, 904 (C.D. Ill. 2015). The second and third elements—no adequate remedy at law and irreparable harm—tend to merge. *Somerset Place, LLC v. Sebelius*, 684 F. Supp. 2d 1037, 1042 (N.D. Ill. 2010). "If these three conditions are met, then the court must balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently." *Mayflower Transit v. Ann Arbor Warehouse Co*., 892 F. Supp. 1134, 1138 (S.D. Ind. 1995) (granting preliminary injunction on breach of contract argument). The balancing involves a sliding scale analysis: "the greater the movant's chance of success on the merits, the less strong a showing must it make that the balance of harms is in its favor." *Storck USA L.P. v. Farley Candy Co*., 14 F.3d 311, 314 (7th Cir. Ill. 1994). Finally, the court must consider the public interest served by granting or denying the relief, including the effects of the relief on non-parties. *Somerset Place, LLC v. Sebelius*, 684 F. Supp. 2d 1037, 1040 (N.D. Ill. 2010); see also *Mayflower Transit*, 892 F. Supp. at 1144.

John Doe's case satisfies each requirement for a temporary restraining order and preliminary injunction. John's request cries out for immediate intervention and injunctive relief. *See infra.*

### A.  John is likely to succeed on his Title IX claims

**1.  John is likely to succeed on his Title IX Claim because the Defendant University of Illinois did not have the jurisdictional authority to initiate the Title IX investigation and proceedings and did not have the authority to act on Jane Roe's Title IX complaint and subsequently dismiss John Doe following Title IX proceedings. The Defendant's decision to deliberately ignore the jurisdictional mandates of Title IX was intentionally done in order to treat John, a male student, differently due to his gender.**

Title IX guarantees that "[n]o person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX "'bar[s] the imposition of university discipline where gender is a motivating factor,'" and is enforceable through a private right of action for injunctive relief and damages. *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016), quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714–15 (2d Cir. 1994).

John Doe asserts three well-established theories of liability under Title IX. A "deliberate indifference" theory requires the plaintiff to ultimately show that "an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the [university's] misconduct." *Mallory v. Ohio Univ.*, 76 Fed. Appx. 634, 638 (6th Cir. 2003); see also *Doe v. Brown Univ.*, 166 F. Supp.3d 177, 190-91 (D.R.I. 2016). A "selective enforcement" theory requires that the school's "decision to initiate the proceeding" or

the "severity of the penalty" "was affected by the student's gender" without regard to guilt. *Yusuf*, 35 F.3d at 715; *Brown*, 166 F. Supp.3d at 185, quoting *Yusuf*. An "erroneous outcome" theory requires that the college "wrongly found" that the student committed the offense. *Yusuf*, 35 F.3d at 715. See *Brown*, 166 F. Supp.3d, at 190–91 (quoting *Yusuf*). The erroneous outcome and actions of the Defendants were wrong, willfully indifferent and extra jurisdictional. The deliberately jurisdictional overreach was based entirely on John Doe's gender as a male.

Since 1972, regulations have been enacted by the Department of Education to enforce Title IX. These regulations interpret Title IX as prohibiting sexual harassment in certain education programs and activities. Title IX's regulations apply to faculty, staff, and also to students of qualifying educational institutions that receive financial support from the federal government. Title IX's regulations require that educational institutions protect its students and employees from harassment, including sexual harassment, and to take steps to remedy any problems and prevent future incidents from occurring.

Title IX itself, and the regulations enforcing it, does not cover the activity that was the subject of Jane Roe's July 2023, Title IX complaint. The Defendants' actions and dismissal pursuant to Jane Roe's Title IX complaint was unlawful and in contravention of Title IX's mandates and jurisdiction. In 2020, the Department of Education issued a 2,033-page set of regulations interpreting how Title IX should be enforced by educational institutions. See https://www2.ed.gov/about/offices/list/ocr/docs/titleix-regs-unofficial.pdf. These regulations limit Title IX investigations and enforcement to sexual harassment that occurs either on-campus or in connection directly with an "education program or activity." These regulations are still in effect and were in effect in May of 2022 and certainly were in effect in July 2023 when Jane Roe's Title IX complaint was made with the Defendants.

In June 2022, the Department of Education proposed new regulations that would expand Title IX coverage. See https://www.ed.gov/news/press-releases/us-department-education-releases-proposed-changes-title-ix-regulations-invites-public-comment. These new regulations, however, are still in the public comment stage. As recently as October 31, 2023, the Department of Education announced that the planned implementation of these new regulations was delayed, with no new date announced. See article at https://www.k12dive.com/news/final-title-ix-rules-delayed-again/698406/.

Jane Roe's Title IX complaint and the subsequent Title IX investigation and discipline was for conduct alleged to have occurred in a private hotel in Nashville, Tennessee in May of 2022. At the time Jane Roe filed the Title IX complaint in July 2023, the 2020 regulations were still in effect and are still currently in effect. Based on these regulations, the substance of Jane Roe's complaint was outside scope of Title IX and any investigation and disciplinary action taken by the Defendants was in contravention to Title IX mandates.

In June 2022, the Department of Education issued an updated Question-and-Answer pamphlet, which was meant to clarify and understand the current regulations. See https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf pg. 8. Questions 9 and 10 from this pamphlet, and the answers provided, explain how the Defendants did not have jurisdiction to rule in this matter. Here are the questions and the answers that were provided in the pamphlet from the Department of Education:

**Question 9:** Which settings are covered by the 2020 amendments?

**Answer 9:** The 2020 amendments apply to reports of sexual harassment in education programs and activities in the United States, including in the following settings:

1. Buildings or other locations that are part of the school's operations, including remote learning platforms;

2. Off-campus settings if the school exercised substantial control over the respondent and the context in which the alleged sexual harassment occurred (e.g., a school field trip to a museum); and

3. Off-campus buildings owned or controlled by a student organization officially recognized by a postsecondary school, such as a building owned by a recognized fraternity or sorority.

For additional information, please see 34 C.F.R. § 106.44(a). For more information on how a school can determine whether it has substantial control over the respondent and context in an off-campus setting, see Question 10.

The 2020 amendments require that schools provide training to their Title IX personnel to "accurately identify situations that require a response under Title IX." 27 OCR also encourages schools to include examples of their programs and activities in each of the three areas described above in their policies, staff training, and student-oriented communications.

Please note that sexual harassment that takes place in settings outside of the United States is not covered under the 2020 amendments.

Schools should also note that, under the 2020 amendments, a school may still offer "supportive measures to a complainant who reports sexual harassment that occurred outside the [school's] education program or activity, and any sexual harassment that does occur in an education program or activity must be responded to even if it related to, or happens subsequent to, sexual harassment that occurred outside the education program or activity."

**Question 10:** How should a school determine whether it has substantial control over the respondent and context in an off-campus setting?

**Answer 10:** The school must make a fact-specific determination. The preamble says that it "may be helpful or useful for a [school] to consider factors applied by Federal courts to determine the scope of a [school's] education program or activity"—such as "whether the [school] funded, promoted, or sponsored the event or circumstance where the alleged harassment occurred"—but also that "no single factor is determinative" in concluding whether the school has substantial control over the respondent and the context in which the reported harassment occurred.

In making this fact-specific determination, the preamble also says:

A school "must consider whether, for example, a sexual harassment incident between two students that occurs in an off-campus apartment" or house is a "situation over which the [school] exercised substantial control [and], if so, the [school] must respond [to notice] of sexual harassment or allegations of sexual harassment that occurred there."

If an incident of sexual harassment between two students in a private hotel room occurs in a context related to a school-sponsored activity, such as a school field trip or travel with a school athletics team, the school would need to consider whether it exercised substantial control over the context in which the sexual harassment occurred.

The preamble adds that a school may have substantial control over an incident that occurred in a student's home, such as where "a teacher employed by a school visits a student's home ostensibly to give the student a book but in reality to instigate sexual activity with the student."

The entire basis for John Doe's dismissal was based on Jane Roe's Title IX complaint and the subsequent Title IX investigation pertaining to allegations Jane Roe alleges to have occurred in a private hotel in Nashville, Tennessee, at a time and location unconnected with the University of Illinois, on May 2, 2022 in a building that was not operated by the University. The allegations do not relate in any way to an off-campus setting over which the University of Illinois exercised substantial control; and it was not in an off-campus building owned or controlled by any student organization affiliated with the University. The activity alleged was not within the context of a school-sponsored activity over which the school exercised control. The allegation isn't even connected to the Nashville dinner. Jane Roe alleges that the alleged touching occurred in a private hotel room wholly unconnected from the University of Illinois. Further, the unrelated Sigma Nu dinner was not an event sponsored or connected to the University of Illinois or a Sigma Nu organization related to the University. The event was in Nashville, Tennessee, and in no way connected or related to the University of Illinois and in no way connected or related to the hotel room. Nor does Jane Roe even allege any misconduct occurred at the dinner, which took place on a different date than the allegation.

According to the Title IX training at the University, evidence is collected through the interview of witnesses. (See https://wecare.illinois.edu/docs/UI-TitleIX-Training-2023.pdf at slide 115.)  The interview of all the relevant witnesses also plays a part for the Panel, who are

the decision-makers. (See https://wecare.illinois.edu/docs/UI-TitleIX-Training-2023.pdf at slide 143) According to Jane Roe, it is alleged that there were two additional witnesses in the Nashville hotel room in the bedroom across from the bed where the alleged touching occurred. Only one witness in the bedroom was ever interviewed. The single witness interviewed contradicted Jane Roe allegations. This witness completely rejected Jane Roe's allegations and recollection of what transpired in the hotel room, down to specifics. Ironically, this witness, without explanation, was not permitted to testify at the hearing. The one other female eyewitness in the hotel room was not interviewed, contacted or presented.

The Defendant, along with Caitlin Kay, intentionally chose not to interview this witness, even though she was made fully aware of the name of the witness. According to Title IX training, the information from the relevant witnesses helps the decision-maker assess the consistency and corroboration of the evidence. (See https://wecare.illinois.edu/docs/UI-TitleIX-Training-2023.pdf at slide 143). The Defendant, and Defendant Caitlin Kay, amongst others, were made aware of two additional witnesses, that the Defendant intentionally elected not to interview. The two witnesses were located in the same room, within feet of Jane Roe, at the time Jane Roe alleges the conduct. The other eyewitnesses who were present could have helped the Defendant, panel and/or committee, evaluate the consistency of the allegations made by Jane Roe. Defendant Caitlin Kay chose not to interview the witnesses, even though she was informed of the witnesses' presence by Jane Roe and the one eyewitness interviewed. The Defendant's decision letter was silent as to why the Defendant ignored the witness that called into the question the veracity of Jane Roe's Title IX complaint. The Defendant and Caitlin Kay's investigation was incomplete and contrary to university training.

The Defendant has never provided any rational explanation or legal justification based on Title IX regulations or any codification, for how the Defendant obtained and exercised jurisdiction over Jane Roe's allegations occurring in a Nashville, Tennessee hotel room. As the Department of Education regulations, the commentary to the regulations, make clear, the Defendant did not have jurisdiction to conduct a Title IX investigation nor did the Defendant have legal authority under Title IX to hold a Title IX hearing unless the conduct was connected to the University of Illinois itself. The evidence heard by the panel was that the alleged activity occurred in Nashville at a private hotel, without any connection to the University or an event under its control. Further, the Defendant has never provided any rational explanation or legal justification for the Defendant's deliberate failure to conduct a complete investigation, despite Title IX training mandating a full and complete investigation.

### B. There is No Other Adequate Remedy at Law for John

To demonstrate an inadequacy of relief at law, a party must show that money damages do not provide a sufficient remedy. See *Cumulus Radio Corp. v. Olson*, 80 F. Supp. 3d 900, 912 (C.D. Ill. 2015). Here, it is readily apparent that money damages would not and cannot remedy John's loss of his degree or the gap in his education. Monetary damages cannot compensate John Doe for the loss of employment at Hinetics, where John is working on ground breaking research to enable the next generation of hybrid electric rockets for NASA which will revolutionize air transportation. Hinetics is a private company located on the campus of University of Illinois. (**See Exhibit A & B**). The Defendant has instructed John Doe that he is not permitted to enter on to University of Illinois property. Thus, the dismissal order is interfering with John Doe's ability to show up for work at Hinetics. Thus, were John to go Hinetics, he would expose himself to arrest for trespassing. **(See Exhibit C, from def. ex. 6-5)**. Similarly, monetary damages will not

remedy the notation of dismissal on his academic transcript and the inclusion of sexual
misconduct and harassment findings in his permanent record.

Furthermore, as the analysis of the adequacy of a remedy at law element and the
irreparable harm element tend to merge, this element is met for the reasons more fully stated in
the following section. See *Somerset Place, LLC*, 684 F. Supp. 2d at 1042 (N.D. Ill. 2010)
(analyzing the no adequate remedy at law element and the irreparable harm element in the same
section as they "tend to merge").

### C. John Will Suffer Irreparable Harm Without Judicial Intervention

To demonstrate irreparable injury, plaintiff must show that he will suffer immediate harm
that cannot be rectified by final judgment after trial. *Anderson*, 274 F.3d at 478. That element is
satisfied here. First, the dismissal of John from the University one week before final exams in his
last fall semester before graduation, and after he has invested hundreds of thousands of dollars in
his education, constitutes irreparable harm. In the context of a college disciplinary matter, a
student's inability to continue or complete his education is *per se* irreparable injury. *Doe v. Univ.
of Cincinnati*, 2016 U.S. Dist. LEXIS 165163, at *17-18 (S.D. Ohio Nov. 30, 2016) (granting
preliminary injunction and finding irreparable harm where the student testified at the injunction
hearing that his suspension "would damage his academic and professional reputation"); *Ritter*,
2016 U.S. Dist. LEXIS 60193, at *8 ("loss of educational and career opportunities" is irreparable
harm); *Tully v. Orr*, 608 F. Supp. 1222, 1225 (E.D.N.Y. 1985) (expulsion is irreparable harm).

Second, courts have held that "a student who is found responsible for sexual misconduct
will likely face substantial social and personal repercussions. . . . a harsh consequence for an
individual ...who was not afforded ... procedural protections." *Brandeis*, 177 F. Supp. 3d at 602;
*Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp.3d 602, 613 (E.D. Va. 2016)

(expulsion for alleged sexual misconduct "plainly calls into question a plaintiff's good name, reputation, honor, or integrity," and "constitutes an alteration of his legal status as a student") (citation omitted).

Third, as a result of the University's contractual breaches, John will be irreparably harmed by the fact that his permanent academic record shall read 'Dismissal with the Opportunity to Apply for Readmission in 2024, based on findings of violations of the sexual misconduct policy. Even if justice prevails and John is found not responsible, or even if he could continue at another college, courts have held that any gap in a college education constitutes irreparable harm. As the court explained in *King v. DePauw University*:

> If [plaintiff] is not permitted to complete this upcoming semester at DePauw ... he will forever have a gap or a senior-year transfer on his record. The Court finds it inevitable that he would be asked to explain another situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct at DePauw. Successfully seeing this lawsuit to its conclusion could not erase the gap or the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding. 2014 U.S. Dist. LEXIS 117075, at *39–40.

See also *Middlebury Coll*., 2015 U.S. Dist. LEXIS 124540, at *9 (finding irreparable harm because "[p]laintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap").

### D. The Harm to John Outweighs Any Potential Harm to the University

The harm John will suffer if he is unable to finish the semester (and graduate in the spring), at the eleventh hour, with only final exams remaining in the final "fall" semester of his

college career, outweighs any potential harm to the University or Defendants from allowing John to complete this Fall semester and sit for his final exams. To the extent the University has concerns — however unreasonable — with regard to allowing John on campus, he could easily take his exams off-campus, online or in some other supervised setting that would allay the University's concerns. Courts consistently find the balance of harms firmly favors students like John. *Ritter*, 2016 U.S. Dist. LEXIS 60193, at *5 (any harm to college is "inconsiderable" compared to harm to student if wrongfully expelled); *Middlebury Coll.*, 2015 U.S. Dist. LEXIS 124540, at *12–14 (balance weighs in favor of student); *King*, 2014 U.S. Dist. LEXIS 117075, at *40–42 (balance of equities "firmly" in student's favor; "the real, unavoidable consequences" he would suffer absent an injunction, even if he ultimately won the case, outweighed any harm to university).

By contrast, there is minimal, if any, harm to the University that would result from this Court granting the temporary restraining order or preliminary injunction and allowing John to sit for his fall final exams and/or attend school for his final semester in the spring and to graduate on time. The University will not suffer harm by ensuring its disciplinary process adheres to the promises made to John Doe and other students. To date, under the facts of this case, the Defendants has breached its contract and promises made to John. Similarly, the Defendant will not suffer harm from a reminder that it must enforce its policies evenhandedly and in a manner that does not violate Title IX. Thus, the colossal harm that John will suffer militates strongly in favor of granting the temporary restraining order or preliminary injunction to allow John to takes his fall semester final exams and/or graduate on time in the spring of 2024.

### E. The Public Interest Weighs in Favor of Granting the Injunction

This element weighs in John's favor. The public, and specifically, the University community, has an interest in seeing the policies "applied fairly to both complainants and respondents in disciplinary actions." *King*, 2014 U.S. Dist. LEXIS 117075 at *43 (finding that there is a public interest in a university or college applying its policies fairly to all parties involved in disciplinary proceeding). "It is always in the public's interest that a student be treated fairly before being disciplined." *Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8; *Doe v. Rector & Visitors of George Mason Univ.*, 179 F. Supp.3d 533, 588 (E.D. Va. 2016) ("[L]eaving in place a wrongfully imposed sanction and the record of such is plainly contrary to the public interest.").

Here, it is abundantly clear that the public interest is best served by the Defendants enforcing all aspects of its policies evenhandedly, particularly where there are overwhelmingly substantial issues with jurisdiction, training and investigatory completeness and the veracity of a complainant's testimony and statements during the investigation. Granting the temporary restraining order will achieve this goal, while also allowing John to complete his college career and graduate on the time and/or at the very least allow him to complete the fall semester's final exams.

## IV. CONCLUSION

John respectfully requests that this Honorable Court grant a temporary restraining order that halts the order of dismissal issued by the University, requires the University to immediately allow John Doe to resume his classes and status at the University of Illinois, and permits John to complete and sit for his fall semester final exams. Further, John requests that this Honorable Court order the University to show cause why a preliminary injunction should not issue.

Respectfully Submitted,

**JOHN DOE**


By:  /s/ Brandon Brown

*Plaintiff's Attorney*


THE BROWN LAW LTD.
4455 S King Drive
Suite 100A
Chicago, IL 60653
T: 773-624-8366
F: 773-624-8365
E: bbrown@thebrownlaw.com

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies, an oath, that the foregoing, AMENDED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF, was served via the Court's electronic filing system on Wednesday, December 13, 2023.


/s/ Brandon Brown