IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| JOHN DOE,<br>    Plaintiff, | )<br>)<br>) |
| v. | )    Case No. 23-cv-2280 |
| UNIVERSITY OF ILLINOIS, et al.,<br>    Defendants. | )<br>)<br>) |

## OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court are Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunctive Relief (Doc. 3) and Plaintiff's Amended Motion for Temporary Restraining Order and Preliminary Injunctive Relief (Doc. 10).

**I.    BACKGROUND[1]**

**A. Introduction**

On December 6, 2023, Plaintiff John Doe[2] filed a complaint and request for declaratory and injunctive relief following a decision by the University of Illinois to dismiss Plaintiff two weeks before exams were to begin for the Fall 2023 semester. (Doc.

---

[1] In setting forth the factual background, the Court has considered Plaintiff's Complaint and request for declaratory and injunctive relief (Doc. 1), Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunctive Relief and memorandum in support thereof (Doc. 3), Defendants' memorandum in opposition to Plaintiff's Motion for Temporary Restraining Order and the attachments thereto (Doc. 6), Plaintiff's Amended Complaint (Doc. 8) and exhibits (Doc. 9), Plaintiff's Amended Motion for Temporary Restraining Order (Doc. 10) and exhibits (Doc. 11), and Plaintiff's Reply (Doc. 12).

[2] Plaintiff was granted permission to proceed in this action under the pseudonym "John Doe." *See* Text Order of 12/14/2023. The University Title IX complainant shall be referred to as "Jane Roe."

1). On December 7, 2023, Plaintiff moved for a temporary restraining order and preliminary injunctive relief. (Doc. 3). At a December 11, 2023, hearing on Plaintiff's TRO Motion, Plaintiff's counsel requested a brief continuance to have adequate time to review Defendants' Response to Plaintiff's Motion. (Minute Entry of 12/11/2023). Thereafter, Plaintiff filed a First Amended Complaint and request for declaratory and injunctive relief (Doc. 8), an Amended Motion for Temporary Restraining Order and Preliminary Injunctive Relief (Doc. 10), and a Reply to Defendants' Response. (Doc. 12). While the initial complaint included various University of Illinois employees and student panel members sued in their individual and official capacities, the amended complaint added the University of Illinois ("the University") and Office of Student Conflict Resolution as Defendants. A hearing was held on Plaintiff's Motions for Temporary Restraining Order and Preliminary Injunctive Relief on December 15, 2023. (Minute Entry of 12/15/2023). During the hearing, counsel for the parties stated final exam period had concluded for the University.

### B. Title IX Complaint and Proceedings

In July 2023, Jane Roe filed a Title IX formal complaint with Defendant Office of Student Conflict Resolution alleging she was sexually assaulted on May 1, 2022 in Nashville, Tennessee, while spending the night at a private hotel following a Sigma Nu formal dinner that Plaintiff and Roe attended. (Doc. 8 at 9-10). Plaintiff alleges the stay at the private hotel had no connection to the Sigma Nu fraternity, and the formal dinner was not connected to the University or any University function. (*Id.* at 10). Roe alleged that at some point after dinner, both she and Plaintiff voluntarily ingested a Molly

(MDMA) before walking around Nashville and sitting on a bench for several hours. (*Id.*) Roe stated they consensually kissed twice while sitting on the bench. (*Id.*) After sitting on the bench for hours, Plaintiff and Roe stopped for food and returned to the hotel room at approximately 1:00 a.m. (*Id.* at 11). Roe changed into shorts and a t-shirt and consensually laid down in the bed with Plaintiff. (*Id.*) Plaintiff shared his vape pen with Roe and they both inhaled hits from the vape pen. (*Id.*) Roe stated she and Plaintiff were consensually "laying on each other" and cuddling in the bed.  As Roe was going to sleep, Plaintiff touched her on her stomach, on her legs over her clothes, under her clothes, and touched her on her vagina, "just on the outside." (*Id.*) She believed Plaintiff touched her breasts over her clothes but could not confirm. (Doc. 6-1 at 11). Roe stated "at least to her knowledge" she did not recall touching Plaintiff that way. (Doc. 8 at 11). Roe alleged she did not invite Plaintiff to touch her but also did not shy away. (*Id.*) Plaintiff and Roe went to sleep and there was no discussion of the incident the following morning. (*Id.* at 11-12).

During the Title IX investigation, Roe was interviewed and told investigators that she and Plaintiff were not romantically involved but were close friends. (Doc. 6-1 at 6). Roe felt intoxicated at a level she reported as 9 out of 10 after taking hits from the vape pen. (*Id.* at 10). Plaintiff did not obtain consent (verbal or otherwise) for touching Roe in a sexual manner. (*Id.* at 10-11). The next day, Plaintiff and Roe did not discuss the touching incident but did exchange text messages over a period of a few weeks in which Plaintiff acknowledged touching Roe under her clothes and apologized repeatedly. (*Id.* at 12-13).

The following text exchanges were submitted as evidence during the Title IX proceedings:

> [Roe]: I didn't want to bring this up during the trip because I didn't want to ruin it for anyone, but do you remember what happened in the hotel? I remember I was so gone and I couldn't move but I was sort of aware, and I remember feeling you touching me like under my clothes. I guess I just want to know why you did it, and I'd also like to know if anything else happened while I was asleep. I spent all day yesterday tryna figure out what to say or do about it. i don't mean to attack you or make you feel bad I just need to know what happened and hear your perspective.
>
> [Plaintiff]: I am so incredibly sorry if I made you uncomfortable in any way, I was feeling you under youre clothes but only because I felt that we were comfortable enough with each other to do so. Nothing happens besides that and honestly I was just going between the covers cuz felt nice on my hand while rolling. I really am sorry if I crossed a line or ruined the trip for you with those actions, I didn't mean any harm or want to do anything you arnt comfortable with.
>
> [ . . . ]
>
> [Roe]: I don't hate you, It seems to me like you didn't realize what you did was technically assault and I appreciate your apology. but the way you handled it after confused me because you seemed more worried about the cooler and the streak than how I might be feeling. I trusted you and it feels like I shouldn't have, and that makes me sad because I trust people so easily and it backfires on me a lot. I can't really say what will happen in the future, but i'm at home now.
>
> [Plaintiff]: I didn't mean to make you think that my largest concern was the streak and cooler. The reason I asked for those and didn't ask about the situation earlier is because I didn't want to rush you to have the conversation, I have a lot of questions about all of Sunday but I didn't want to bombard you with all of them over text and make you feel like I was being impatient by not giving you enough time. How I thought was the best way to handle this (which I know see is wrong) was to ask for the cooler then when I see you ask if we could have a conversation about everything later but sense you left I can't really do that. i just truly thought that was the best orders of operation. I do see now what I did was completely and utterly wrong (I honestly don't know what the fuck was wrong with me to think that what I did was okay at the time I really am sorry again) and moving forward in my life I will make sure this situation doesn't happen again (I actually do know what the fuck was wrong with me, it's cuz I wasn't thinking about your feeling and how you would feel in that situation). your trust in me is completely gone but

> I really do wanna gain the trust you had in my back. I know this isn't going to be easy in any way or take little time sense you need to see actual character change in regard to what I did to you, but honestly really enjoyed hanging out with you[.]

(*Id.* at 28, 31-32).

Plaintiff was interviewed in connection with the investigation with his attorney present. (*Id.* at 15-18). In response to questions about the incident in Nashville on May 1, 2022, Plaintiff repeatedly answered: "Based on the advice of my attorney, I'm unable to answer that question at this time. I may be able to answer that question at a later date and time." (*Id.* at 16-18). He further stated, "We look forward to providing answers to the questions after receiving notes. [W]e look forward to providing supporting information once we receive the notes." (*Id.* at 17-18).

As part of the investigation, two witnesses Roe had identified were interviewed. A fraternity member who was in the hotel room on the night in question stated that he was asleep and did not observe anything unusual between Plaintiff and Roe. (*Id.* at 19-23). Roe's roommate stated that, on May 2, 2022, upon returning from Nashville, Roe stated that Plaintiff had touched her under her clothes and, after Roe confronted Plaintiff by text, he essentially admitted everything. (*Id.* at 22, 26).

A 33-page evidence packet was assembled, which included a Title IX Formal Complaint, notes of the interviews of Roe, Plaintiff, and two witnesses, and the text messages between Roe and Plaintiff from May 2, 2022, to October 19, 2022. (Doc. 6-1). Plaintiff and Roe each received the evidence packet and were given an opportunity to submit written responses. (Doc. 6 at 7). Plaintiff's counsel sent a letter that generally

denied any wrongdoing, stating that "[t]he allegations lack credibility, lack reliability, and are unsustainable." (Doc. 6-2).

On November 1, 2023, a three-person panel convened a hearing that Plaintiff did not attend. (Doc. 6-3). Plaintiff's attorney attended the hearing as Plaintiff's representative. (*Id.*) On November 8, 2023, the panel issued a written decision determining that Plaintiff was found responsible for Sexual Assault (fondling) and Title IX Sexual Harassment, sexual assault, and he was dismissed from the University with eligibility to petition for readmission for the Fall 2024 semester. (Doc. 6-4). The decision letter provided that the panel found that Roe's statements and the text message evidence were consistent, that Plaintiff did not dispute that he specifically stated "I touched you under your clothes" in a text message, and he apologized for doing so on multiple occasions via text message. (*Id.* at 2).

**C. Plaintiff's Appeal**

Following Plaintiff's appeal, an appeal committee of the Senate Committee on Student Discipline met on November 30, 2023, to consider the following issues identified by Plaintiff: (1) procedural irregularities; and (2) sanctions not appropriate for the violation. (Doc. 6-5 at 1-2). The appeal committee rejected Plaintiff's appeal in a December 1, 2023 letter, finding that dismissal with the option to petition for readmission in the Fall of 2024 was appropriate with published sanctioning guidance. (*Id.* at 1). The committee addressed Plaintiff's jurisdiction argument as follows:

> To the point that there were concerns about jurisdiction through a Title IX lens: A recognized student organization (RSO) organized an off-campus formal event in Nashville, TN. As this event was an RSO sponsored event through an

> affiliation with the national fraternity's office, once the students left the Champaign-Urbana area and until their return to Champaign, the trip was a university endorsed activity. The university's Title IX procedures were applied in alignment with the Department of Education's guidance.
>
> To the point there were concerns about an off-campus incident not affecting the university's community interest: Even if the Title IX jurisdiction application had failed, according to Student Code 1-301.b, the university's interest was affected when one student allegedly was involved in misconduct towards another student. According to Student Disciplinary Procedures Article One, Section 1.05, the "alleged misconduct indicates the student poses a threat to the safety or security of any individual" directs the conduct process to evaluate and adjudicate.

*Id.*

### D. Plaintiff's Claims and Allegations

Plaintiff filed a five-count complaint on December 6, 2023. (Doc. 1). Plaintiff's Amended Motion for Temporary Restraining Order only addresses Plaintiff's likelihood of success as to Count I alleging the University violated Plaintiff's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* (Doc. 8 at 23-25). Plaintiff argues Defendants conducted a "sham Title IX investigation and subsequent sham Title IX disciplinary proceedings, lacking any semblance of objectivity, fairness or due process." (Doc. 10 at 1). The disciplinary proceedings were in response to a "spurious Title IX Complaint and allegations brought in July 2023" by University of Illinois student Jane Roe, who alleged "she was sexually assaulted, by unlawful touching, nineteen months ago in May 2022, in a Nashville, TN hotel room, after a dinner and night out on the town in Nashville, Tennessee, that had absolutely no nexus to the University of Illinois." (*Id*). Plaintiff alleges he was unlawfully and permanently dismissed from the University due to these allegations. (*Id.* at 2). He asks the Court to "grant a temporary

restraining order that halts the order of dismissal by the University, requires the university to immediately allow John Doe to resume his classes and status at the University of Illinois, and permits John to complete and sit for his fall semester final exams." (*Id.* at 19).

## II. DISCUSSION

### A. Legal Standards

To obtain preliminary injunctive relief, whether through a temporary restraining order or preliminary injunction, a plaintiff must show that (1) his underlying case has some likelihood of success on the merits, (2) no adequate remedy at law exists, and (3) he will suffer irreparable harm without the injunction. *Woods v. Buss*, 496 F.3d 620, 622 (7th Cir. 2007). If those three factors are shown, the court then must balance the harm to each party and to the public interest from granting or denying the injunction. *Id.*; *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013); *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999).

"The first step in the analysis requires a plaintiff to demonstrate that his claim has some likelihood of success on the merits, not merely a better than negligible chance." *Doe v. University of Southern Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) (internal quotation marks and citations omitted). The first step is often decisive. *Id.* As for the second and third steps, courts consider whether a temporary restraining order is necessary to prevent irreparable harm that "cannot be fully rectified by the final judgment after trial." *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 680 (7th Cir. 2012). "[S]peculative injuries do not justify this extraordinary remedy." *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005).

To establish a Title IX discrimination claim, a plaintiff must show "(1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on gender." *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019). Although Plaintiff purports to assert different types of Title IX claims, the Seventh Circuit has held that "tests or categories labeled 'erroneous outcome' or 'selective enforcement' or 'deliberate indifference' or 'archaic assumptions' need not be considered because at bottom they all ask the same question: whether the alleged facts, if true, raise a plausible inference that the university discriminated . . . on the basis of sex?" *Id.* at 854-55 (internal quotation marks omitted).

The standard for asserting gender discrimination sufficiently to obtain emergency injunctive relief is much higher than the relatively lenient pleading standards a plaintiff must meet to withstand a motion to dismiss. *See Doe v. Univ. of Southern Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) ("In assessing the merits, we do not accept John's allegations as true, nor do we give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings. . . . We also do not give John the benefit of conflicting evidence, as we would in reviewing a grant of summary judgment."). "[F]ederal district and appellate courts do not provide third and fourth forums—after the university committee's hearing and the administrative appeal—to decide what actually happened between Jane and John on the night" in question." *Id.* at 792. This Court's inquiry is limited to whether Plaintiff is likely to be able to show the

University discriminated against him due to sex in dismissing him based on Roe's complaint and all available evidence. *Id.*

### B. Likelihood of Success on the Merits

Plaintiff alleges he is likely to succeed on his Title IX claim because the University lacked jurisdictional authority to initiate the Title IX investigation and lacked authority to act on Jane Roe's Title IX complaint and dismiss Plaintiff from the University. Plaintiff further asserts he has no other adequate remedy at law because damages are inadequate, and he will suffer irreparable harm without judicial intervention due to the gap in his educational record. Plaintiff further asserts that the harm to him absent an injunction outweighs any minimal harm to the University. Finally, Plaintiff claims the public interest weighs in favor of granting the injunction because it would demonstrate that policies are applied fairly to complainants and respondents in disciplinary proceedings.

Plaintiff's argument that he is likely to succeed on his Title IX claim because the University lacked jurisdictional authority to investigate an occurrence in a private hotel 350 miles from campus is without merit. Any sexual assault by a student of another University student poses a threat to the safety or security of a member of the University community creating an obvious nexus to the University, for which the Student Code expressly calls for in the student discipline process. (*See Student Code*, Art. I, section 1.05).

Additionally, the preamble to the Title IX regulations states that, for sexual misconduct occurring in geographic locations that fall outside of Title IX's regulatory scope, "nothing precludes [the University] from addressing the alleged misconduct through the [University's] own code of conduct." 85 FR 30026, 30206. Therefore, like

many other schools, the University establishes procedures that expressly allow for investigation of sexual misconduct that, for whatever reason, does not qualify as Title IX Sexual Harassment, including the geographic location of the actual assault. *See Student Code*, ("Reports or complaints of sexual misconduct that are not one of the categories included in Title IX Sexual Harassment will be addressed following the processes set out in the Office for Student Conflict Resolution's Case Coordinator and Subcommittee Hearing Procedures (for student respondents)"). Therefore, Plaintiff's argument that there was no jurisdiction under Title IX because of the location of the incident is without merit.

Furthermore, there was a legitimate basis to consider Roe's allegations as meeting Title IX requirements because a recognized student organization (RSO), Plaintiff's fraternity, was involved. *See* 85 FR 30026, 30197 ("a postsecondary institution must investigate formal complaints alleging sexual harassment that occurred in a fraternity or sorority building (located on campus, or off campus) owned by [or controlled by] the fraternity or sorority, if the postsecondary institution has officially recognized that Greek life organization"). The University provided an explanations for why they applied Title IX (the fraternity formal was considered an "RSO sponsored event" and a "university endorsed activity") to Plaintiff in writing in the Appeal letter. (Doc. 6-5 at 1). There is no indication Plaintiff's gender had anything to do with that determination. Because Plaintiff's jurisdictional arguments fail and Plaintiff is unable to show the University discriminated against him on the basis of sex, Plaintiff has failed to establish he has a reasonable likelihood of success on the merits.

### C. Adequacy of Remedy at Law and Irreparability of Harm

Even if Plaintiff could establish a likelihood of success on the merits, the Court concludes Plaintiff has an adequate remedy at law and is unable to show irreparable harm. To demonstrate irreparable harm, a plaintiff must show it is likely he will suffer "harm that cannot be repaired and for which money compensation is inadequate." *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (internal quotation marks omitted). Plaintiff alleges money damages cannot remedy his loss of a degree, the gap in his education, or the inclusion of sexual misconduct and harassment findings on his permanent record. Plaintiff further alleges money damages cannot compensate him for the loss of employment at Hinetics, a private company on the University's campus.

While the Court recognizes Plaintiff will certainly face some harm, these are precisely the types of harm that monetary damages can address. *See Doe v. Bd. of Trustees of the Univ. of Ill.*, 2017 WL 11593304, at *2 (C.D. Ill. Dec. 18, 2017) (*Doe I*) (noting plaintiff could attend other universities or apply for readmission after two and one-half years and a final judgment in plaintiff's favor could restore any reputational harm; *Doe v. Trustees of Indiana Univ.*, 2020 WL 7028030, at *2, 7 (S.D. Ind. Nov. 30, 2020) (*Doe II*) (noting damages would be adequate to remedy gap in education after plaintiff was found responsible for engaging in dating violence and suspended from medical school with the opportunity to return one year later).

Here, Plaintiff will be able to apply for reinstatement in less than one year and, if he prevails on the merits in this case, he can easily quantify the monetary damages he suffered as a result of the loss of his employment with Hinetics. As the *Doe I* and *Doe II*

courts found, Plaintiff's concern about harm due to a gap in his academic record is speculative and, even if established, could be remedied by monetary damages. Regarding Plaintiff's concern that sexual misconduct and harassment findings will be included on his permanent record, Defendants allege "the record of Plaintiff's suspension is protected from disclosure without his consent by the Family Educational Rights and Privacy Act." *Doe v. Vassar College*, 2019 WL 6222918, at *6 (S.D. N.Y. Nov. 21, 2019) (no irreparable harm). Therefore, the Court finds that the harm Plaintiff faces is not irreparable, and Plaintiff has an adequate remedy at law.

### D. Balance of Harms

Even if the Court had found that Plaintiff could meet the elements of likelihood of success, inadequate remedy at law, and irreparable harm, the Court would still find that the balance of harms between the parties and consideration of the public interest weigh in favor of the University. The Court does not take lightly the harm that Plaintiff faces as alleged in his motion. While Plaintiff's request that he be permitted to complete the Fall semester and sit for his final exams off-campus, online, or in some other supervised setting might at first glance seem reasonable, the University has its own policies and practices and has a strong interest in enforcing those policies and practices uniformly — particularly disciplinary matters relating to alleged sexual misconduct under the Title IX regulations and the University's Student Code. If the University were to grant Plaintiff's requested accommodations, other individuals who find themselves in a similar position would request the same treatment. This would undermine the University's disciplinary system and potentially weaken its ability to address sexual misconduct pursuant to the

Title IX and OSCR Policies. While Plaintiff will suffer some degree of harm due to the delay in completing his degree, he has an opportunity to apply for reinstatement for the Fall 2024 semester or he could seek admission to another school to finish his degree. Furthermore, if Plaintiff prevails on the merits, any harm that he suffers can be adequately addressed. Therefore, the balance of harms favors the University.

### III.  CONCLUSION

For all of these reasons, the Court concludes Plaintiff is not entitled to a temporary restraining order or preliminary injunction. Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunctive Relief [Doc. 3] and Amended Motion for Temporary Restraining Order and Preliminary Injunctive Relief [Doc. 10] are hereby DENIED.

ENTER: March 13, 2024

_____
COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE